[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 28, 2006
THOMAS K. KAHN
CLERK

No. 04-12420
_____

D. C. Docket No. 04-00988-CV-1-MHS

BANKWEST, INC.,
ADVANCE AMERICA, CASH ADVANCE CENTERS OF GEORGIA, INC.,
COMMUNITY STATE BANK,
FIRST AMERICAN CASH ADVANCE OF GEORGIA, LLC,
CASH AMERICA FINANCIAL SERVICES, INC.,
GEORGIA CASH AMERICA, INC.,
FIRST BANK OF DELAWARE,
CREDITCORP OF GEORGIA, LLC,
COUNTY BANK OF REHOBOTH BEACH, DELAWARE,
EXPRESS CHECK ADVANCE OF GEORGIA, LLC,

Plaintiffs-Appellants,

versus

THURBERT E. BAKER, Attorney General of the State of Georgia,
CATHY COX, Secretary of State, for the State of Georgia,
in their official capacities,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(April 28, 2006)

Before CARNES, HULL and HILL, Circuit Judges.

PER CURIAM:

This appeal having been remanded by the en banc court to this panel,

BankWest, Inc. v. Baker, __ F.3d __ (11th Cir. Apr. 27, 2006) (en banc), we have

before us the issue of whether Appellants' appeal from the district court's May 13,

2004 order denying their motions for a preliminary injunction is now moot. After

review, we conclude that it is. Accordingly, we vacate our own prior decision in

this case, BankWest, Inc. v. Baker, 411 F.3d 1289 (11th Cir.), reh'g granted, 433

F.3d 1344 (11th Cir. 2005) (en banc), vacated __ F.3d __ (11th Cir. Apr. 27, 2006)

(en banc), vacate the district court's May 13, 2004 order, BankWest, Inc. v. Baker,

324 F. Supp. 2d 1333 (N.D. Ga. 2004) (denying preliminary injunction), and

dismiss this appeal as moot.

## I. Factual Background

### A. The Parties' Loan Programs

The four Appellant banks are BankWest, Inc. ("BankWest"), County Bank

of Rehoboth Beach, Delaware ("County Bank"), Community State Bank ("CSB"),

and First Bank of Delaware ("FBD"). The Appellant banks are state-chartered

institutions located in South Dakota and Delaware. Each bank entered into a

servicing agreement with one or more of the Appellant non-bank parties, who are

Advance America, Cash Advance Centers of Georgia, Inc. ("Advance America"), First American Cash Advance of Georgia, LLC ("First American"), Cash America Financial Services, Inc. ("Cash America"), Georgia Cash America, Inc. ("Georgia Cash America"), Creditcorp of Georgia, LLC ("Creditcorp"), and Express Check Advance of Georgia, LLC ("Express Check"). The four Appellant banks are paired with their in-state agents as follows:

- BankWest and Advance America

- CSB and First American, Cash America, and Georgia Cash America

- County Bank and Express Check

- FBD and Creditcorp

Appellants, banks and agents, contended that the banks were making loans to Georgians using the non-bank agents in Georgia. The type of loans at issue in this case are short-term loans that are single-advance, single-payment loans, in amounts up to $500 for terms of four to forty-five days, with maturity dates generally coinciding with the borrower's next payday, so that the loans are termed "payday loans." At maturity, the borrower is required to repay the principal plus a finance charge of anywhere from 17% to 27% of the amount advanced, depending on the term of the loan. For a two-week loan, these finance charges are equivalent to an annual percentage rate of interest between 443% and 520%.

3

The particular payday loan programs at issue in this appeal are evidenced by the consumer loan agreement and the separate servicing agreement provided by BankWest, which we have been led by the parties to believe are typical of those used by all four banks and their in-state agents. Prior to the enactment of the Georgia Act at issue, Appellants were making and administering the type of payday loan program reflected in the loan and servicing agreements in the record.

B.     Procedural History

In April 2004, the Georgia legislature enacted Senate Bill 157, 2004 Ga. Laws 440, now codified at Ga. Code Ann. §§ 16-17-1 to 16-17-10 (the "Act"). The Act provides that its effective date is May 1, 2004.

Shortly after the Act was passed, each of the four Appellant banks, joined by its Georgia agent or agents, filed a complaint (the "complaints") against the Appellees, the Georgia Attorney General and the Georgia Secretary of State (the "State"). Each complaint sought a temporary restraining order and preliminary and permanent injunctive relief against enforcement of the Act, as well as a declaratory judgment that the provisions of the Act that apply to their payday loan programs and servicing agreements, which predated the Act, were preempted by federal law and were unconstitutional. The district court consolidated the four cases and heard argument on the motions for a preliminary injunction.

4

Because the Act was scheduled to go into effect on May 1, 2004, the district court entered a temporary restraining order prohibiting enforcement of the Act against Appellants in their respective conduct of their payday loan businesses at issue in the case.

Two days before the temporary restraining order was set to expire, the district court denied Appellants' motions for a preliminary injunction and refused to enter an injunction pending appeal. The district court found that Appellants had failed to demonstrate a likelihood of success on the merits as to any of their claims. The court also concluded that the balance of harms favored the State and weighed against issuing an injunction and that enjoining enforcement of the Act would harm the public interest.

Appellants then filed notices of appeal as well as motions asking this Court to issue an injunction pending appeal. We denied the motions for an injunction pending appeal.

On June 10, 2005, a panel of this Court affirmed the district court's preliminary injunction ruling in a 2-1 decision. See BankWest, 411 F.3d 1289. On December 28, 2005, this Court en banc granted Appellants' petition for rehearing en banc and vacated the panel decision. See BankWest, Inc. v. Baker, 433 F.3d 1344 (11th Cir. 2005).

5

On March 15, 2006, while the case was being briefed at the en banc stage, the State filed a suggestion of mootness. The State contends that this appeal is now moot as a result of regulatory actions or activities of the Federal Deposit Insurance Corporation ("FDIC") that, as a practical matter, have caused the Appellant banks not only to cease making the type of short-term loans at issue but also to withdraw from the servicing agreements that were the subject of the preliminary injunction ruling. In short, the State argues that Appellants are no longer pursuing or even poised to pursue or resume the particularized short-term loan program and servicing agreements that were the subject of the preliminary injunction motions and this appeal. Appellants filed responses to the suggestion of mootness, which we detail later, most of which contend that the appeal is not moot.

On April 27, 2006, the en banc Court vacated its order granting rehearing en banc and remanded the appeal to the panel to address the mootness issue, BankWest, __ F.3d __ (11th Cir. Apr. 27, 2006), which we now do.

## II.  Discussion

### A.  Cessation of Payday Loans and Servicing Agreements

The State's suggestion of mootness represents that as a result of the regulatory actions or activities of the FDIC, the Appellant banks have ceased making the type of payday loans at issue in this appeal and have withdrawn from

6

the servicing agreements or agency relationships with the Appellant non-bank parties also at issue here.

Appellants do not contest the State's factual representations, and indeed, their written responses appear to concede them.  For example, BankWest's response to the suggestion of mootness acknowledges that

> the FDIC . . . advised BankWest that it should exit the payday lending business unless it could immediately present to the FDIC a plan as to how it intended to satisfy the FDIC's stated concerns . . . . At this time, BankWest has elected not to pursue such a plan with the FDIC, and is effectively out of the classic payday lending business in Georgia . . . .

BankWest Response to Suggestion of Mootness at 7.  Similarly, CSB's response states that "[b]ecause of regulatory pressure from the FDIC unrelated to the merits of this case, the Bank is in the process of discontinuing its Payday Loan program . . . ."  CSB Response to Suggestion of Mootness at 2.

Likewise, County Bank's response states that

> [i]n 2005, the FDIC issued its *Guidelines on Payday Lending* which became effective in July, 2005.  As a result of these new federal rules that limited the number and duration of payday loans, County Bank made a determination that it was no longer profitable for County Bank to be involved with this type of lending.  As of December 14, 2005, County Bank ceased offering "payday" loans and, as of December 31, 2005, County Bank ended its relationships with all of its loan servicers.

County Bank and Express Check Response to Suggestion of Mootness at 3-4.  In

7

the same vein, FBD's response states that "[t]he State's suggestion of mootness with respect to . . . [FBD] . . . is based on a press release issued by FBD . . . to the effect that the Bank has been forced by the [FDIC] to discontinue making 'payday loans.'" FBD Response to Suggestion of Mootness at 1. FBD does not contest that it issued the press release, which the State provided to this Court, or that it has stopped making the type of payday loans at issue here.

As we have already noted, this appeal involves a specific type of short-term loan program in Georgia, termed payday lending, that was conducted through a particular set of loan and servicing agreements. The amounts, terms, duration, and conditions of the short-term loans at issue and the extensive provisions of the servicing agreements formed the factual foundation of the preliminary injunction ruling in the district court and framed the issues on appeal. See BankWest, 324 F. Supp. 2d at 1339-40; BankWest, 411 F.3d at 1292-96; BankWest, 411 F.3d at 1312-14 (Carnes, J., dissenting).

Given the recent developments and significant change in factual circumstances, including the complete collapse of the factual underpinning of the preliminary injunction ruling, we agree with the State that the present appeal from the preliminary injunction ruling no longer presents a justiciable controversy within the meaning of Article III of the Constitution. We now discuss the case-or-

8

controversy constraint on our jurisdiction and then explain why we must dismiss this appeal as moot.

B.    Case-or-Controversy Principles

"The rule that federal courts may not decide cases that have become moot derives from Article III's case and controversy requirement." Sierra Club v. EPA, 315 F.3d 1295, 1299 (11th Cir. 2002); see also U.S. Const. art. III, § 2. "'[A]n action that is moot cannot be characterized as an active case or controversy.'" Al Najjar v. Ashcroft, 273 F.3d 1330, 1335 (11th Cir. 2001) (citation omitted). The "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477, 110 S. Ct. 1249, 1253 (1990); accord Horton v. City of St. Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001).

"Dismissal of a moot case is required because mootness is jurisdictional." Sierra Club, 315 F.3d at 1299. "The 'case or controversy' constraint imposes a 'dual limitation' known as 'justiciability' on federal courts." De La Teja v. United States, 321 F.3d 1357, 1361 (11th Cir. 2003) (citations omitted). "'The doctrine of justiciability prevents courts from encroaching on the powers of the elected branches of government and guarantees that courts consider only matters presented in an actual adversarial context.'" Id. (citations omitted).

9

As the Supreme Court has defined the doctrine of mootness, "'a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" Id. at 1362 (citing Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951 (1969)). A case can become moot either "due to a change in [factual] circumstances, or . . . [due to] a change in the law." Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328 (11th Cir. 2004). "If a lawsuit is mooted by subsequent developments, any decision a federal court might render on the merits of [the] case would constitute an [impermissible] advisory opinion." Nat'l Adver. Co. v. City of Miami, 402 F.3d 1329, 1332 (11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1318 (2006); see also Coral Springs, 371 F.3d at 1328. "An appellate court simply does not have jurisdiction under Article III 'to decide questions which have become moot by reason of intervening events.'" Brooks v. Ga. State Bd. of Elections, 59 F.3d 1114, 1119 (11th Cir. 1995) (citations omitted). "[T]he Article III 'case or controversy' requirement mandates that the case be viable at all stages of the litigation; 'it is not sufficient that the controversy was live only at its inception.'" Id. (citation omitted). We determine on a case-by-case basis whether a case or controversy exists. GTE Directories Publ'g Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1567 (11th Cir. 1995); Hendrix v. Poonai, 662 F.2d 719, 721-22 (11th Cir. 1981).

10

C.      Application of Case-or-Controversy Principles to This Appeal

Application of these well-established case-or-controversy principles to this appeal is not difficult. The payday loan programs that formed the heart of, and gave rise to, the preliminary injunction ruling are no longer being used by any of the Appellants. More importantly, the FDIC has taken certain regulatory action and Appellants have now abandoned their servicing agreements and are no longer in a position to offer, or resume offering, the payday loans that were the subject of the preliminary injunction ruling. As a result, Appellants no longer have a legally cognizable interest in obtaining an injunction against enforcement of the Act as it might have applied to their making and administering these particular types of payday loans and servicing agreements. See De La Teja, 321 F.3d at 1362 (stating that a case is moot when the parties lack a legally cognizable interest in the outcome).

Indeed, the motions for a preliminary injunction and the district court's ruling on them were specific as to the particular loan program reflected in the loan and servicing agreements in the record. Stated another way, the appeal before us is about the validity of the Act as applied to a specific type of payday loan said to be between the Appellant banks and Georgia borrowers, and serviced and marketed through a specific type of servicing agreement between the banks and a specific

11

type of non-bank agent in Georgia. We recognize that the parties still dispute whether the Act is legally valid. However, Appellants have not just ceased but have exited the payday loan business reflected in the loan and servicing agreements in the record. For that reason, they no longer have a legally cognizable interest in the issue of whether the Act can be validly applied to those loans and servicing agreements. In short, there is no actual adversarial context for our ruling in this appeal. See id. at 1361 (noting that "'courts consider only matters presented in an actual adversarial context'") (citation omitted). Thus, this appeal of the district court's denial of Appellants' motions for a preliminary injunction no longer presents a live controversy.[1]

Appellants, or at least some of them, raise two primary arguments as to why their appeal of the preliminary injunction ruling is not moot. We address each argument in turn.

D.    Collection of Pre-Act Loans

Three of the Appellants (BankWest, Express Check, and Creditcorp) argue that the appeal is not moot because they already own or may purchase loans that were made before the effective date of the Act, which they have not collected.

---

[1]We have before us only the appeal from the denial of a preliminary injunction, and that is what we hold is moot. We do not have before us the issue of whether the complaints themselves are moot. That is an issue for the district court to decide.

They say that they are afraid to collect those loans because of the threat that the Act's sanctions will be applied to them. They contend that the Act cannot be validly applied to those loans, and therefore, the State should be enjoined from attempting to apply it to them.

More specifically, BankWest states that it "had loans outstanding of over $8,100,000 representing funds advanced on Small Excess Rate Loans prior to the effective date of the Act" that it stopped collecting due to the "risk of violating" the Act. BankWest Response to Suggestion of Mootness at 3, 5. BankWest asserts that if the Act were deemed to be preempted, it "would evaluate whether to resume collection activities or sell its portfolio, taking into account the relevant costs and benefits." Id. at 5.[2]

One servicer, Express Check, asserts that in April 2004, it acquired all of County Bank's uncollected pre-Act loans, worth approximately $385,232, and that it ceased collecting those loans as of the effective date of the Act. Additionally, Creditcorp, another servicer, states that it "intends to collect loans currently

---

[2]Notably, in their June 4, 2004 panel brief, BankWest and Advance America advised the Court that "Advance America has been forced to cease all loan origination activity on behalf of [BankWest] and will only remain open to accept principal payments for [BankWest] on loans made by BankWest prior to May 1, 2004, and during the term of the TRO." This indicates that two years ago, when initially appealing the district court's order denying them preliminary injunctive relief, BankWest and Advance America apparently believed that they could collect on their pre-Act loans, a position that conflicts with their recent responses to the State's suggestion of mootness.

outstanding to [FBD] . . . if the Georgia law is preempted," although Creditcorp concedes that it "has not purchased any of the loans made by FBD" and is only "informed" that "FBD would need Creditcorp to collect those loans in Georgia" if and when the Georgia law was overturned.  Decl. of Creditcorp President Steve Scoggins at 2 ("Scoggins Decl.").

The insurmountable hurdle for Appellants is that these uncollected loans, by Appellants' own admission, were made prior to the effective date of the Act, and in this case, the State has never suggested that the Act applies retroactively to loans made before the effective date of the Act.  Indeed, the State conceded in the district court that the Act does not apply to pre-Act loans, the district court agreed, BankWest, 324 F. Supp. 2d at 1356, and no party has suggested in its appellate briefs that the Act does apply to pre-enactment loans.

Therefore, although some Appellants own or may purchase uncollected pre-Act loans, there is no case or controversy as to those loans.  See Graham v. Butterworth, 5 F.3d 496, 500 (11th Cir. 1993) (where Florida Attorney General and local state attorney had "repeatedly stated that the statute does not prohibit the appellants' proposed conduct . . . [,] the appellees [could not] enforce [the] statute against the appellants," and the case was "render[ed] . . . moot"); see also Christian Coal. of Ala. v. Cole, 355 F.3d 1288, 1293 (11th Cir. 2004) (case was moot where

the "supposed 'enforcement policy'" of a regulatory body was evidenced only by a withdrawn advisory opinion and the plaintiffs could be "reasonably certain" that charges would never be filed under the enforcement policy). Indeed, Appellants make no allegation that the State or anyone else has threatened to prosecute them under the Act for their pre-Act loans.

Furthermore, even without the Georgia Attorney General's explicit concession, there would be no credible or objectively reasonable threat of future enforcement of the Act against these pre-Act loans. Cf. Doe v. Pryor, 344 F.3d 1282, 1287-88 (11th Cir. 2003) (plaintiffs lacked standing to challenge a statutory provision where there was no credible threat of their being prosecuted under it after the state attorney general had stated that it could not be constitutionally applied to them and where fear of prosecution was not "objectively reasonable"). Georgia law is clear that the Act does not apply to these pre-Act loans. The Georgia Supreme Court has held that a statute applies only prospectively unless the statute itself expressly states otherwise. See Polito v. Holland, 258 Ga. 54, 55, 365 S.E. 2d 273, 273 (1988) (substantive statutes "prescribe for the future and that is the construction to be given unless there is a clear contrary intention shown"). The Act contains no statement that it applies retroactively, and thus, under Georgia law, it applies only prospectively. Furthermore, the Georgia Code itself provides that

15

"[l]aws prescribe only for the future; they cannot impair the obligation of contracts nor, ordinarily, have a retrospective operation." Ga. Code Ann. § 1-3-5 (emphasis added). Thus, because prosecution under the Act as to pre-Act loans clearly would be contrary to Georgia law, as well as to the clear and unequivocal position of the Georgia Attorney General, this appeal is moot in spite of the existence of the pre-Act loans.

There never was any controversy in this appeal about whether the Act can be applied to the uncollected loans that were made before the Act's effective date. Although, as we will explain later, mootness requires that we vacate the district court's order, the district court in this case concluded, as we do, that "[u]nder Georgia law, a statute is presumed to apply only prospectively unless it expressly states otherwise." BankWest, 324 F. Supp. 2d at 1356. On that basis, the district court rejected the Appellants' claims that the Georgia statute was "an unconstitutional ex post facto law insofar as the de facto lender provisions criminalize loans that were legally made before the effective date of the Act." Id. That ruling—that the Act did not apply to loans made prior to the effective date of the Act—was not contested on appeal by any party. This is yet another indication that there is no credible or objectively reasonable threat of prosecution under the Act against Appellants with regard to their pre-Act loans.

16

Accordingly, we reject Appellants' argument that this appeal is not moot due to uncollected, pre-Act loans.

E.    New Loan Programs

Three Appellants (CSB, FBD, and Creditcorp) argue that this appeal is not moot because they intend to develop, or are in the process of developing, a new consumer loan program, and the presence of the Act interferes with their ability to develop new loan products.[3]  For example, CSB's response to the suggestion of mootness indicates that "at the same time as it is winding down its Payday Loan program, [it] is actively working on a different consumer lending program (the "New Program") with Plaintiff Cash America Financial Services, Inc. . . ."  CSB Response to Suggestion of Mootness at 2-3 (emphasis added).  CSB argues that its new, but different, loan program might comply with the FDIC's new rules but still violate the Act.

Similarly, while FBD is discontinuing the particular payday loan program that is the subject of this appeal, FBD asserts that the Act "defines the term 'payday loans' much more broadly than does the FDIC" and more broadly than the type of payday loans that FBD is discontinuing.  FBD Response to Suggestion of

_____

[3]To the extent that the other Appellants adopt these arguments as their own, or argue that if the case is not moot as to one party it is not moot as to all parties, we consider those arguments as well.

Mootness at 1. From this statement, FBD also argues that it may develop a new loan program that may comply with the FDIC's new rules but that may still violate the Act. Additionally, Creditcorp indicates that it "would consider marketing these bank products in Georgia" if the Act were declared invalid. Scoggins Decl. at 1.

The fact that some Appellants may be retooling their business plans, may develop another type of short-term loan, and may enter into new servicing agreements with the non-bank parties in Georgia does not keep this appeal from being moot. The precise nature of the new but different loan programs and the manner in which they are to be administered in Georgia remain far too speculative and abstract at this juncture to create an actual case or controversy. See Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S. Ct. 447, 449 (1992) ("It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions . . . .'") (citation omitted). Furthermore, there has been no showing that even if Appellants were to create new loan programs and enter into new servicing agreements, they would be able to satisfy the relevant regulatory authorities. The mere possibility of new loan programs is not sufficient to present a justiciable controversy. If we addressed issues that might arise, we would be rendering an advisory opinion on future conduct and events that may never occur, something which Article III does not

18

permit us to do.

Based on a speculative, abstract set of factual circumstances that may or may not come to pass, Appellants are asking this Court to declare preempted and unconstitutional an Act of the Georgia legislature. It may or may not be that a future loan program, if one is developed by Appellants and if it does not run afoul of regulatory authorities, could justify a motion for leave to amend the complaint, or a new motion for a preliminary injunction, if the future turns out the way Appellants hope it does. But those "if's," that speculation, and those contingencies cannot keep the current appeal of the preliminary injunction ruling, tied as it is to the prior loan programs and servicing agreements, from being moot. See Ethredge v. Hail, 996 F.2d 1173, 1174-76 (11th Cir. 1993) (where plaintiff's initial motion for a preliminary injunction was specific in seeking relief so that plaintiff could display stickers critical of former President Bush, who was no longer in office, appeal was moot because the administrative order at issue only forbade stickers critical of the "Commander in Chief"; plaintiff's "propensity to criticize Presidential policies" and likelihood of criticizing future presidents did not present a live controversy as to the appeal of the district court's preliminary injunction ruling); Wakefield v. Church of Scientology of Cal., 938 F.2d 1226, 1229 n.1 (11th Cir. 1991) ("This [C]ourt reviews the case tried in the district court; it does not try

19

ever-changing theories parties fashion during the appellate process.").

In sum, there is a justiciability gap in this case because Appellants have discontinued their old loan programs and servicing agreements and have not replaced them with any new ones presenting the same legal issues that were decided by the district court when it denied Appellants' motions for preliminary injunction. If we were to rule on those legal issues, which are no longer presented, we would be "overstepping our judicial authority" by rendering an "impermissible advisory opinion about a non-existing" set of facts. Cole, 355 F.3d at 1293.

Thus, we reject Appellants' claims that their intent, aspirations, or ongoing efforts to develop a new loan program that they hope will dodge any FDIC objections but think may still violate the Act keeps this current appeal from becoming moot.

## III.  Conclusion

For all of the foregoing reasons, we conclude that the district court's denial of Appellants' motions for a preliminary injunction—the only ruling at issue in this appeal—is moot. This conclusion compels us to dismiss this appeal and to vacate the district court's order, because "when an issue in a case becomes moot on appeal, [we] not only must dismiss as to the mooted issue, but [we must] also vacate the portion of the district court's order that addresses it." De La Teja, 321

F.3d at 1364; see also Soliman v. United States, 296 F.3d 1237, 1243 (11th Cir. 2002) ("Under our precedent, when a case becomes moot on appeal, [we] must not only dismiss the case, but also vacate the district court's order.").

Our well-established practice of vacating the district court's order when we dismiss a moot appeal "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." Soliman, 296 F.3d at 1243 (citations and quotation marks omitted). If Appellants do eventually create new loan programs and enter into new servicing agreements that are not blocked by the regulatory authorities but are prohibited by the Act, Appellants should not be "forced to acquiesce in [the district court's] moot, adverse decision" without having had the benefit of full appellate review on the merits of that decision. Al Najjar, 273 F.3d at 1340; see also De La Teja, 321 F.3d at 1364. Rather, if all these events and contingencies do occur, the parties may then elect to litigate the issues created by the new loan programs and new servicing agreements. Accordingly, we vacate our prior decision, BankWest, 411 F.3d 1289, we vacate the district court's May 13, 2004 order denying the motions for preliminary injunctive relief, BankWest, 324 F. Supp. 2d 1333, and we dismiss this appeal as moot.

**PRIOR DECISION VACATED, DISTRICT COURT ORDER VACATED, AND APPEAL DISMISSED.**

21